# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

DENISE M. HENNING, CPA LLC, individually
and on behalf of all others similarly situated,

       Plaintiff,

   v.

THE PNC FINANCIAL SERVICES GROUP,
INC.; and PNC BANK, N.A.,

       Defendants.

**Civil Action No. 2:20-cv-00905-WSS**

Judge William S. Stickman

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST
AMENDED CLASS ACTION COMPLAINT**

## INTRODUCTION

This case involves an historic emergency relief effort—the Paycheck Protection Program (PPP)—that accomplished its purpose in part because of the hard work of agents like Plaintiff who shepherded their small business clients through the PPP loan process. The clients ("borrowers") had to do a great deal very quickly to obtain the much-needed loans: understand the contours of the program, pull together payroll and other financial data, choose a lender, and submit an application—while knowing that the limited loan money would be disbursed on a first-come, first-served basis. For this, many had to rely on their agents. The lender Defendants, in comparison, acted as middlemen, lending the taxpayers' money at no risk to themselves, and received generous compensation in the form of origination fees. The question presented here is whether the lenders must share a percentage of those fees with the agents as required by the statute and its implementing regulations.

In enacting the PPP, Congress anticipated that borrowers would seek assistance from their accountants, financial advisors, and other similar agents, and that such agents would be compensated for their services. The statute itself says so: "An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the [SBA]." 15 U.S.C. § 636(a)(36)(P)(ii). It would make no sense to limit a fee without an expectation of a fee in the first place. The SBA agrees, and also was clear as to the source of that compensation: "Who pays *the* fee to an agent who assists a borrower? Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds." SBA Interim Final Rule ("IFR"), 85 Fed. Reg. 20811, 20816 (Apr. 15, 2020) (emphasis added).[1]

---

[1] Full title: Business Loan Program Temporary Changes Paycheck Protection Program.

Defendants do not challenge either of these key propositions, nor could they given the plain statutory text and commonsense agency explication. Instead, Defendants' central contention is not that agents cannot recover fees at all, but that to do so, agents were required to jump through a series of administrative hoops applicable to the SBA's regular small business loan program (known as "7(a) loans"). This argument assumes that the PPP is a mere extension of the ordinary 7(a) process and subject to the same terms and conditions.

That assumption has no foundation. The entire point of the PPP was speed—*immediately* saving businesses and jobs from the crushing economic effects of a pandemic. Congress and the SBA deliberately created a streamlined program that would cut through time-consuming red tape and release funds as quickly as possible. Defendants' position—that agent fees should be subject to regular 7(a) protocols, even though that is nowhere stated in any regulation or guidance— ignores the many important differences between the two programs and defies common sense.

Defendants also argue that Plaintiff may not recover agent fees because the CARES Act did not expressly provide a private right of action for Plaintiff to do so. But it is commonplace for plaintiffs to bring state-law claims based in whole or in part on federal substantive standards, as Plaintiff has done here. For these reasons, and because Plaintiff adequately pled its common law and statutory claims, Defendants' motion to dismiss should be denied.

## **BACKGROUND**

### A.      **The PPP was enacted to provide immediate relief to small businesses.**

The PPP was a life raft crafted by Congress to keep the economy from sinking. Congress enacted the CARES Act,[2] including the PPP, in response to a "crisis [] totally unprecedented in living memory." 166 Cong Reg. S2059 (Mar. 25, 2020). The economic fallout of the COVID-19

---

[2] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 111-31 (2020).

pandemic was immediate, enormous, and devastating. FAC at ¶ 26.[3] As "stay at home" orders were issued by states and localities across the nation, businesses were forced to overhaul their business models, scale back operations dramatically, or shutter—temporarily or permanently. *Id.* With the slowdown and closing of businesses came rampant layoffs.

In response, Congress created the PPP to provide hundreds of billions of dollars in guaranteed and forgivable loans through the SBA to small businesses to prevent layoffs in the immediate term. FAC at ¶ 27; *see also* 166 Cong. Rec. H1819 (Mar. 27, 2020) (Rep. Brady) ("We focus on preserving businesses to preserve jobs, to get them through these next few weeks."). The "intent of the Act" was straightforward: "that SBA provide relief to America's small businesses expeditiously," IFR, 85 Fed. Reg. at 20811; *see also* FAC at ¶ 29; 166 Cong. Rec. S2060 (Mar. 25, 2020) (Sen. Sullivan) ("[D]eliver rapid relief to small businesses that are being crushed by this pandemic and having to lay off workers."). Recognizing the need for "immediate implementation," the SBA acted quickly, issuing the IFR a mere two weeks after the President signed the Act and making it immediately effective. *See* IFR, 85 Fed. Reg. at 20811 (finding "good cause" to "dispense with the 30-day delayed effective date provided in the APA"); FAC at ¶¶ 27, 30.

**B.   Congress and the SBA provided that agents would be compensated out of lenders' origination fees.**

It was obvious to Congress and the SBA that borrowers would be very likely to use agents—accountants, financial advisors, etc.—to assist them in applying for and obtaining PPP loans. FAC at ¶ 33. The nature of the loans made that inevitable: they were designed to protect paychecks, and so required proof of how much businesses spent on payroll historically, information often most readily accessible to businesses' financial advisors and accountants. *Id.*

---

[3] "FAC" refers to the First Amended Class Action Complaint, ECF No. 16.

Establishing eligibility for a loan required documents "such as payroll processor records, payroll tax filings, or Form 1099-MISC, or income and expenses from a sole proprietorship." IFR, 85 Fed. Reg. at 20812 (setting out most common methodology); *see also* 15 U.S.C. § 636(a)(36)(E) (tying loan amount to payroll data). Businesses also had to provide the information quickly, as the loans were advertised to be disbursed on a first-come, first served basis. FAC at ¶ 31. And for most borrowers, loans were taken with the expectation of eventual forgiveness, requiring an upfront understanding of how the money could be used, as well as ongoing accounting. *See* FAC at ¶¶ 29, 46; 15 U.S.C. § 636(a)(36)(F); IFR, 85 Fed. Reg. at 20813-14.

Critically, and consistent with the PPP's mission of providing relief without delay, the SBA absolved lenders of any obligation to verify the accuracy of the applications. FAC at ¶¶ 2, 8; *see also* IFR, 85 Fed. Reg. at 20812. Instead, lenders were permitted "to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness." *Id.* This was a dramatic departure from the SBA's standard 7(a) loan programs, in which approved lenders are delegated responsibility to make credit approval determinations. *See* 13 C.F.R. § 120.150 (setting forth criteria); SBA, *Guide to SBA Programs* (Feb. 2013), at 6.[4] Under the PPP, by contrast, the onus of ensuring the accuracy of submitted information was placed squarely on the borrowers. FAC at ¶ 3. Under express penalty of criminal sanction, including imprisonment up to *thirty years*, borrowers were required to certify "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects." IFR, 85 Fed. Reg. at 20814. This is another reason why Congress foresaw that small businesses would seek assistance from professional

---

[4] https://www.sba.gov/sites/default/files/articles/SBA%20101.pdf.

accountants, tax preparers, and the like before certifying the accuracy of their submissions. FAC at ¶ 3; *see also* 15 U.S.C. § 636(a)(36)(P)(iv) ("It is the sense of the Senate that the Administrator should issue guidance to lenders *and agents* . . . .") (emphasis supplied).

And, understanding that agents would not work for free, but wishing to preserve the entirety of the loan funds for use in protecting paychecks, Congress expressly provided that "[a]n agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator." 15 U.S.C. § 626(a)(36)(P)(ii); *see also* FAC at ¶ 4. Consistent with the statutory mandate, the SBA subsequently clarified that "[a]gent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds." IFR, 85 Fed. Reg. at 20816; FAC at ¶ 35; *see also* SBA, *Paycheck Protection Program (PPP) Information Sheet Lenders*,[5] at 2 ("**How will agents be compensated?** Agent fees will be paid out of lender fees. The lender will pay the agent.") (emphasis in original). Accordingly, the agency set out a compensation schedule setting agent fees as a subset of the lender fees, and providing that "[t]he total amount an agent may collect from the lender for assistance in preparing an application for a PPP loan . . . may not exceed" specified amounts:

| LOAN SIZE | LENDER FEE | AGENT FEE |
|---|---|---|
| Up to $350,000 | 5% | 1% |
| Between $350,000 and $2,000,000 | 3% | .5% |
| $2,000,000 or more | 1% | .25% |

*PPP Information Sheet* at 2; *see also* FAC at ¶ 35. The SBA and the Treasury specifically determined that these limits are "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans." IFR, 85 Fed. Reg. at 20816.

---

[5] https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf?

### C. **Plaintiff effectuated the purpose of the PPP by assisting small businesses in applying for and obtaining PPP loans.**

Plaintiff is an accountant who assisted small business clients in applying for and obtaining PPP loans. FAC at ¶¶ 15, 43, 45. Plaintiff guided the submission of its client's loan application to Defendants, and submitted its client's application as an authorized representative of Plaintiff's borrower client. *Id.* at ¶¶ 48-49. To properly assist its clients, Plaintiff spent considerable time and effort familiarizing itself with the PPP program and related SBA regulations. *Id.* at ¶ 44. Plaintiff played a primary role in assisting its clients with their PPP loan applications by, *inter alia*, gathering and analyzing its clients' documents, calculating payroll information needed for the application, providing and reviewing its clients' documentation, and reviewing its clients' applications before filing. *Id.* at ¶ 46. In short, Plaintiff and the putative class were necessary and integral to the success of the PPP process.

## LEGAL STANDARDS

To survive a Rule 12(b)(6) motion, the allegations in a complaint must meet a standard of "plausibility," which is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I. **The PPP Requires Agent Fees Be Paid By Lenders Out of Their Origination Fees.**

#### A. **Congress and the SBA provided for agent fees.**

Defendants cannot dispute that the PPP provides for agents to receive fees for assisting borrowers with PPP applications, and that such fees must come, if anywhere, from the fees paid to lenders. For good reason: The SBA prohibited agents from recovering fees from their clients (sensibly so, given that such fees would reduce the urgently-needed loan benefits). Accordingly,

if fees could *not* be recovered from lenders, then either (1) borrowers would be prohibited from using agents to assist them with PPP applications or (2) agents would be required to work for free. Either outcome is absurd and could not be Congress's intent.

Given this, Defendants' focus on whether Congress authorized lenders to pay fees without a preexisting written compensation agreement is a red herring. Mot. at 12-13. It cannot be disputed that Congress anticipated such fees expressly in the statute, 15 U.S.C. § 636(a)(36)(P)(ii), and that the SBA determined that payment should come from lender fees rather than from borrowers, FAC at ¶ 35.

Defendants principally rely on two out-of-circuit cases, *Sport & Wheat, CPA, PA v. ServisFirst Bank, Inc.*, No. 3:20CV5425-TKW-HTC, 2020 WL 4882416 (N.D. Fla. Aug. 17, 2020), and *Profiles Inc. v. Bank of Am. Corp.*, No. SAG-20-0984, 2020 WL 1849710 (D. Md. Apr. 13, 2020), to argue that Plaintiff is not entitled to agent fees.[6] Defendants' reliance on these cases is unavailing. The *Sport & Wheat* case is distinguishable because there the plaintiff's complaint conceded defendants' argument that 7(a) procedures must be followed. 2020 WL 4882416 at 3, n.8 (noting that plaintiff's complaint alleged that a PPP agent must submit an agreement in writing on Form 159). Here, Plaintiff makes no such concession. In any event, Plaintiff respectfully submits the decision is wrongly decided because it ignores the practical reality that banks—like Defendants—will refuse to work with borrower's agents in order to keep a larger portion of fees to themselves and thus forcing borrowers to go it alone or agents to work *gratis*, rendering PPP regulations and statutes regarding agent fees a nullity. *See, e.g.*, *In re Oxborrow*, 913 F.2d 751,

---

[6] While not raised in argument, in their recitation of the facts, Defendants rely on Treasury Secretary Steven Mnuchin's testimony, Mot. at 5. That testimony is "beyond the four corners of" Plaintiff's complaint and, therefore, cannot be considered at this stage. *McAssey v. Discovery Mach., Inc.*, No. 4:16-CV-705, 2018 WL 4016994, at *2 (M.D. Pa. Jan. 12, 2018), *report and recommendation adopted*, No. 4:16-CV-00705, 2018 WL 4002991 (M.D. Pa. Aug. 21, 2018).

754 (9th Cir. 1990) ("[W]e must avoid statutory interpretation that renders any section superfluous and does not give effect to all of the words used by Congress.").

*Profiles, Inc.*, which found no private right of action under the CARES Act—*but see infra* at § II.A—is also distinguishable because it dealt with a separate provision of the CARES Act regarding borrower qualifications, not agent fees. 2020 WL 1849710, at *3. Notably, Defendants omit that *Profiles, Inc.* was not a Rule 12(b)(6) motion to dismiss decision, but a decision regarding the "drastic remed[ies]" of a temporary restraining order and preliminary injunction. *Id.* at *3. Consequently, the standard governing the *Profiles, Inc.* decision is much more rigorous than that governing a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Compare id.* ("Courts should grant such mandatory preliminary injunctions only when the applicant's right to relief [is] indisputably clear."), *with Snatchko v. Peters Twp.*, No. 2:12-CV-1179, 2012 WL 6761369, at *14 (W.D. Pa. Dec. 28, 2012) (reasoning that while "a Court may be skeptical that plaintiff can fulfill the elements," plaintiff's allegations are "enough to withstand a motion to dismiss").

Defendants also incorrectly argue that interpreting the CARES Act to require the payment of agent fees would displace common-law principles underpinning contracts. Mot. at 13. Defendants' argument ignores the common law principles constituting the third-party beneficiary principle, *see infra* § II.B.1. Furthermore, Defendants' reliance on *U.S. v. Texas* is unavailing because there, the Supreme Court merely held that in addition to the United States' remedies under the Debt Collection Act, the federal government also possessed a common-law right to collect pre-judgment interest. 507 U.S. 529, 530 (1993). By contrast, here Defendants cite this case to do the opposite, *i.e.*, to work a restriction on Plaintiff's rights to collect agent fees under the CARES Act and the common law. In fact, the CARES Act and resulting requirement to remit agent fees

constitute an "affirmative statute" that entitles agents to fees in connection to PPP applications, and therefore, "does not abrogate the common law." *Wheaton v. Peters*, 33 U.S. 591, 691 (1834).

Finally, Defendants' assertion that Plaintiff cannot rely on regulations promulgated under the CARES Act to obtain agent fees is inconsistent with their own reliance on the IFR and the SBA's "Frequently Asked Questions" regarding PPP loans "make[] clear" Defendants' entitlement to lender fees. Mot. at 6-7, 11. Defendants cannot have it both ways by rejecting the IFR when it comes to agent fees but relying on it—along with an FAQ—when it comes to lenders' fees.[7]

### B.   Agents were not required to comply with regular 7(a) procedures.

Defendants' argument is not that agents are never entitled to fees, but that an undisclosed precondition to such fees was a multi-step process of paperwork and approval where agents first obtain lenders' authorization and agreement to pay a specified fee, Mot. at 6, 12. This imagined process finds no support in the statute or SBA regulations, and is inconsistent with the PPP's essential function.

### 1.   Defendants are wrong that 7(a) loan procedures apply to the PPP.

Defendants' premise that, absent specific directive otherwise, PPP loan applications were governed by the standard 7(a) loan procedures is wrong. Congress elected to graft the PPP onto the existing SBA 7(a) loan statute, but with fundamental differences. The SBA properly recognized that the PPP was a "new loan program" with an urgent mission that required "streamlining the requirements of the regular 7(a) loan program." IFR, 85 Fed. Reg. at 20811-12. Accordingly, "[t]he

---

[7] Defendants also attempt to concoct a conflict between the SBA's regulations and Congress. However, the CARES Act and regulations promulgated thereunder are in harmony—"An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the [SBA]." 15 U.S.C. § 636(a)(36)(P)(ii). It would make no sense for Congress to limit a fee without an expectation of a fee in the first place, and the SBA's regulation is a "reasonable interpretation" of this statute. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement." *Id.* at 20812.

The conflicts between the PPP and standard 7(a) loan programs are legion. For example, 7(a) does not permit the SBA to compensate *anyone* (lenders or agents) for originating loans, while the PPP provides for the SBA to pay lender fees. 7(a) requires lenders to pay SBA a guarantee fee; the PPP does not. 7(a) prohibits agent contingency fees; the PPP requires them. 7(a) does not require that lenders pay agents out of the fees the lender receives (because there are none), while the PPP mandates just that. And so on.

Adopting the full complement of 7(a) procedures would have irredeemably compromised the PPP's mission. The SBA's standard loan program is a regular, ongoing government initiative replete with red tape and lengthy delays. That may be acceptable during normal times, but is irreconcilable with the PPP's "overarching focus on keeping workers paid and employed." IFR, 85 Fed. Reg. at 20814. For example, the SBA identifies no fewer than *fourteen* steps a borrower must complete before receiving a standard 7(a) loan. *See* SBA, *Steps in the Life of an SBA Loan.*[8] It is widely reported that the process of receiving such a loan is long and arduous. *See*, *e.g.* Erica Seppala, *How Long Does It Take To Get An SBA Loan Approved?*, Merchant Maverick (Feb. 11, 2020)[9] ("With typical lenders, the process of receiving an SBA loan takes up to two or three months. . . . . The process requires patience; potential borrowers must go through many steps of paperwork and vetting."). And application and approval does not mean funds are available—with standard 7(a) loans, lenders have discretion to delay funding up to *two years. See* SBA, *7(a) Loan*

---

[8] https://www.sba.gov/content/steps-life-sba-loan.
[9] https://www.merchantmaverick.com/sba-loan-approval-time/.

*Closing Checklist*[10] ("The Lender may establish its own disbursement schedule as long as all loan proceeds are disbursed within 24 months after the date of the approval.").

Defendants' position that *all* 7(a) processes, no matter how time-intensive or hindering of the PPP's mission, apply to PPP loans unless Congress expressly provides otherwise is based on a single sentence in the CARES Act stating: "Except as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection." 15 U.S.C. § 636(a)(36)(B). This murky language does not bear the weight Defendants would put on it. It refers only to how the SBA "guarantee[s]" PPP loans, not how the SBA does anything else, including paying fees to lenders or to agents.

## 2.   Defendants' proposed process makes no sense given the purpose of the PPP.

The PPP was an emergency program in which everyone—the SBA, lenders, agents, and borrowers—was expected to and did act with incredible alacrity in saving businesses and jobs. But not according to Defendants. Their theory is that any borrower who wished to use its accountant to help apply for a loan needed to either convince that accountant to work for free or wait to apply for a loan until the agent received lenders' approval to assist PPP loan applicants, and worked out the fee arrangement. Defendants acknowledge that fees were offered as "inducement for lenders to participate," Mot. at 11, but apparently contend that agents required no reciprocal encouragement and should work for free. It is inconceivable that Congress and the SBA, having created a deliberately "streamlined" process in response to a national emergency, intended for agents to wait on a lender's good graces before assisting their clients—particularly when funding was limited and offered on a first-come, first-served basis. *See* IFR 85 Fed. Reg. at 20813.

---

[10] https://www.sba.gov/node/4950.

Defendants' rule also makes no practical sense. Why would a lender, required to pay any agent fees out of its own pocket, *ever* agree to pay a reasonable fee? And, in any event, Defendants have answered that question categorically: they "would not pay customers' agents in connection with PPP loans." Mot. at 5. Defendants' outright refusal to pay fees thwarts the CARES Act. The agents' only leverage in the negotiation would be the threat that without the agent's assistance, no loan application would be made (and so no origination fee for the bank). But there was no shortage of loan applicants; instead, Congress had to apportion additional funds to meet demand, and even extend the deadline to apply. If it were delegated to lenders to pre-approve agents' work, lenders would be free to simply reject applications that involved agents—a result antithetical to the purpose of the PPP given that it would punish borrowers for engaging agents.

Defendants also assert that these procedures are necessary to deter "fraud and abuse," with Defendants' main contention being that a written compensation agreement prevents agents from "charging inappropriate or unreasonable fees to applicants or lenders." Mot. at 13. However, Defendants ignore that Congress and the SBA have already addressed this concern by delineating how much agents get paid, as well as who pays them. FAC at ¶ 35. The requirement that lenders pass on a portion of their compensation for offering zero-risk loans to agents who are necessary for the PPP's success and speed is hardly "inappropriate."

## II.   Plaintiff's State-law Claims Are Adequately Pled

### A.   A lack of a federal private right of action under the SBA's enabling statute does not preclude state-law claims.

Defendants argue that the Small Business Act does not provide a private cause of action. But that does not preclude common law claims based on Small Business Act regulations. It is well-established that "[t]he absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the

federal law." *Bukowski v. Wells Fargo Bank, N.A.*, 757 F. App'x 124, 129 (3d Cir. 2018) (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 581 (7th Cir. 2012)). So too with the SBA. In *Aardwoolf Corp. v. Nelson Capital Corp.*, the Second Circuit upheld state law claims asserted by a small business that required a lender to return the unearned portion of prepaid interest, where repayment was required by an SBA regulation. 861 F.2d 46, 48 (2d Cir. 1988). The court explained that although the Small Business Act does not provide a private right of action for a debtor to recover the interest, "this does not mean that the pertinent Small Business Administration regulations would have no relevance to a New York court. There is nothing in the Small Business Act that would prevent a New York court from looking to the Act for standards to apply in fashioning or applying New York's own common law." *Id.* at 48-49 (citations omitted). Other circuits have widely recognized this rule as correct. *See, e.g.*, *Integrity Mgmt. Int'l, Inc. v. Tombs & Sons, Inc.*, 836 F.2d 485, 494-95 (10th Cir. 1987) (finding that Congress did not intend "to preclude states from using the SBA standards as evidence of violations of the states' causes of action for fraud, unjust enrichment, or the like").[11]

Defendants principally rely on two cases to make the false assertion that the absence of a federally created private right of action also invalidates state law claims.  In *Astra USA, Inc. v. Santa Clara County*, the Supreme Court held that plaintiffs could not sue on a third-party beneficiary theory to enforce a requirement under the Public Health Services Act capping the prices of certain prescription drugs. 563 U.S. 110, 115 (2011). Three facts, none present here, were

---

[11] *See also, e.g.*, *Iconco v. Jensen Constr. Co.*, 622 F.2d 1291, 1296-99 (8th Cir. 1980) ("Congress has not forbidden . . . Iowa to use the Small Business Act as a standard in determining whether Jensen has committed fraud or been unjustly enriched at the expense of Iconco."); *Tectonics, Inc. v. Castle Constr. Co.*, 753 F.2d 957, 960-64 (11th Cir. 1985) ("Congress, by enacting the Small Business Act, did not . . . preclude a state cause of action based upon the Act[.]"); *Crandal v. Ball, Ball & Brosamer*, 99 F.3d 907, 910 (9th Cir. 1996) (explaining that even though the Small Business Act does not "give [plaintiffs] a remedy," they "already have remedies under . . . state law").

critical to the Court's holding. First, whether a manufacturer had complied with the statutory cap depended on its "average" and "best" prices, calculation of which "is a complex enterprise requiring recourse to detailed information about the company's sales and pricing," information submitted confidentially to the government which was not permitted to disclose it. *Id.* at 115. The Court explained that had "Congress meant to leave open the prospect of third-party beneficiary suits . . . . it likely would not have barred the potential suitors from obtaining the very information necessary to determine whether their asserted rights have been violated." *Id.* at 121. Second, the statute itself provided a specific administrative remedy for overcharge claims. *Id.* at 115-16, 121-22. And third, the crucial factual determination at issue—a manufacturer's "average" and "best" prices—also was used to set rebate amounts under a wholly separate federal program, creating a "risk of conflicting adjudications." *Id.* at 120 & n.6.

None of the considerations underlying the holding in *Astra* exist here. Plaintiff's claims do not depend on a complex data analysis requiring confidential information in the government's possession. Congress and the SBA laid out a straightforward formula and process for agents to obtain fees under the PPP. FAC at ¶¶ 35-36. Critically, *there is no administrative remedy under the CARES Act* for plaintiffs wrongfully deprived of agent fees. *Cf. Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984) ("It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct."). And the PPP agent fee issue is not connected to other programs.

*Umland v. PLANCO Fin. Servs., Inc.*, is similarly inapplicable. 542 F.3d 59 (3d Cir. 2008). There, plaintiff attempted to sue her employer for unlawfully withholding an additional percentage of plaintiff's salaries for taxes. *Id*. at 68. However, Congress explicitly barred lawsuits like plaintiff's via statute. *Id.* Defendants here cannot and do not argue the existence of such a statute.

Moreover, in *Umland*, the plaintiff could have availed herself of the IRS' administrative procedures. *Id.* at *66-67. Not so for Plaintiff here.

**B.**     **Plaintiff adequately alleges common law claims.**

**1.**     **Plaintiff is a third-party beneficiary of both lender agreements and loan contracts which Defendants breached.**

Plaintiff alleges that Defendants entered into agreements with the SBA pursuant to which Defendants agreed to adhere to all PPP rules and regulations and incorporated those requirements by reference. *E.g.*, FAC at ¶¶ 73, 74. Plaintiff alleges that Defendants and the SBA "understood that agents involved in the preparation and submission of PPP loan applications would need to be compensated." *Id.* at ¶ 73. The PPP rules unambiguously required lenders to pay agent fees under the PPP. Under the contracts between the SBA and the Defendants, the Defendants agreed to comply with PPP rules. *Id.* at ¶ 73. By refusing to remit agent fees to Plaintiff, Defendants have breached this agreement. *Id.* at ¶ 76.

The lender agreement is governed by federal common law, "which is informed by general principles of contract law and by the Restatement (Second) of Contracts." *Pittsburgh Nat. Bank v. Abdnor*, 898 F.2d 334, 338 (3d Cir. 1990); *see also Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014) (citing *Dobson v. Hartford Financial Servs. Group, Inc.*, 389 F.3d 386 (2d Cir. 2004)). In *Dobson*, the Second Circuit recognized that courts may enforce the intention of the parties, taking the circumstances of the contract's formatting into account, "despite a lack of express terminology." 389 F.3d at 399. Here, it is clear from the contract as a whole that PPP loans are to be made consistent with the entirety of the PPP program rules, FAC at ¶¶ 73-74, which provide for agent involvement and compensation. Indeed, due to the extreme "circumstances under which [the contract] was made," agent involvement was "indispensable to effectuate the intention of the parties." *Dobson*, 389 F.3d

at 399 (quoting *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 329 (1927)). Defendants suggest there is a more exacting standard for government contracts, but that is only to the extent that members of *the general public* are assumed to be only incidental beneficiaries of government contracts. *See* Restatement (Second) of Contracts § 313(2) cmt. a ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.").[12]

For the same reasons, the Court should sustain the breach of contract claim based on Plaintiff's third-party beneficiary status under the specific agreements between Defendants and the borrower whom Plaintiff assisted. FAC at ¶¶ 78-82. Under Pennsylvania law, which Defendants argue applies (Mot. at 18), "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Guy v. Liederbach*, 501 Pa. 47, 60, 459 A.2d 744, 751 (Pa. Sup. Ct. 1983) (quoting Restatement (Second) of Contracts § 302)). The contract need not "expressly state that the third party is intended to be a beneficiary" for a party to qualify as a third-party beneficiary under the foregoing test. *Burks v. Fed. Ins. Co.*, 2005 PA Super 297, ¶ 8, 883 A.2d 1086, 1088 (Pa. Super. Ct. 2005). Thus, Plaintiff qualifies as a third-party beneficiary under the agreement between Defendants and borrowers as well.

### 2.     Defendants were unjustly enriched at Plaintiff's expense.

---

[12] Thus, the tests in *Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*, 817 F. Supp. 2d 515, 531 (E.D. Pa. 2011) and *Liem Duc Nguyen v. U.S. Catholic Conference*, 548 F. Supp. 1333, 1349 (W.D. Pa. 1982) are inapplicable. In any event, Plaintiff is no "incidental beneficiary" given that the CARES Act and SBA regulations promulgated thereunder and expressly incorporated into the contract confer a direct benefit onto Plaintiff—its agent fees.

To prevail on an unjust enrichment claim under Pennsylvania law, a plaintiff must establish "(1) that [p]laintiff[] conferred a benefit on [d]efendant[]; (2) [d]efendant[] appreciated the benefit; and (3) acceptance and retention of those benefits by [d]efendant[] would, under the circumstances, make it inequitable for [d]efendant[] to retain the benefit without paying for the value of the benefit." *Cesare v. Champion Petfoods USA Inc.*, 429 F. Supp. 3d 55, 65 (W.D. Pa. 2019). Plaintiff adequately alleges each element.

*First*, Plaintiff conferred a benefit (origination fees) on Defendants. *E.g.*, FAC at ¶¶ 32, 36, 41-42, 53 (Plaintiff's work for its client resulted in a $2,823.45 origination fee for Defendants), 56.  *Second*, Defendants appreciated the benefit, as evidenced by the fact they were expressly aware that Plaintiff was acting as agent for its client's PPP loan application. FAC at ¶¶ 49-51. *Third*, equity and good conscience support Plaintiff's claim. Defendants received handsome payment for issuing no-risk loans, a portion of which payment was specifically allocated for agents. Defendants have unfairly retained the portion of the fees that rightfully belongs to Plaintiff, who was indispensable to the submission of PPP loan applications and Congress' intent to get businesses money expeditiously. FAC at ¶¶ 31, 36, 52.

Defendants' suggestion that Plaintiff was a mere "volunteer" is demonstrably false. Defendants were aware of Plaintiff's involvement in its client's PPP application and were aware that Plaintiff requested agent fees through her client, to which she is rightfully entitled. FAC at ¶¶ 48-51. In fact, the loan application submitted to Defendants specifically asked whether an agent assisted in the preparation of Plaintiff's client's application. FAC at ¶ 50. Plaintiff was also bound by its ethical duties to its client not to abandon the client's application. FAC at ¶ 52. Thus, Defendants' reliance on *Martin v. Little, Brown, & Co.*, 450 A.2d 984, 988 (Pa. Super. Ct. 1981) is unavailing given that Plaintiff was not a "volunteer"; her services were sought by borrowers and

were indispensable to Congress' intent.

Finally, Defendants' argument that Plaintiff "should have been aware" that she would not be paid agent fees must be rejected because it is based on extrinsic documents—namely, an industry document, ECF No. 19-2—which cannot be considered on a Rule 12(b)(6) motion to dismiss.[13] *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). In any event, the document warns there is a "possibility" that agents may not be paid—not whether that refusal is justified. Indeed, under Defendants' logic, the possibility of a person unjustly enriching themselves would work to preclude every possible unjust enrichment claim.

### 3.    Defendants have converted Plaintiff's fees.

The elements of a claim for conversion are: "(1) deprivation of another's right of property in, or use or possession of, (2) a chattel, (3) without the owner's consent, and (4) without lawful justification." *Lankard v. Laurel Mountain Midstream Operating, LLC*, No. 1367 WDA 2016, 2017 WL 2539844, at *8 (Pa. Super. Ct. June 12, 2017). It is well established that "[m]oney can be the subject of conversion." *Spector Gadon & Rosen, P.C. v. Rudinski, Orso & Lynch*, 2020 PA Super 91 (Pa. Super. Ct. Apr. 7, 2020). Plaintiff alleges each element: (1) an immediate and superior right to the agent fees in question, (2) Defendants are withholding those fees in deprivation of Plaintiff's rights, (3) without consent, and (4) without lawful justification. FAC at ¶¶ 96-103. Defendants primarily rely on *Sport & Wheat* to argue that Plaintiff has no statutory right to agent fees and, therefore, has not adequately pled a conversion claim. Mot. at 16. However, *Sport & Wheat* is distinguishable in this regard for the reasons discussed above, *supra* § I.A.

---

[13] Although there are two narrow exceptions to this rule under the judicial notice and incorporation by reference doctrines, Defendants do not and cannot claim that either these narrow exceptions apply to this document. *See* Fed. R. Civ. P. 201(b); *Schmidt*, 770 F.3d at 249. The document itself provides ample reason to disregard it at this stage, given that it cautions that its contents are "non-authoritative." ECF No. 19-2 at 10.

### 4.    Defendants have misappropriated Plaintiff's labor.

Defendants assert that Plaintiff's misappropriation claim fails because Pennsylvania does not recognize the tort of the misappropriation of funds. Mot. at 17. However, Plaintiff alleges that Defendants misappropriated Plaintiff's labor and skills, and in Pennsylvania, the misappropriation of "the skill, expenditures and labor of another" is an actionable tort. *Centennial Lending Grp., LLC v. Seckel Capital, LLC*, No. 822 EDA 2016, 2017 WL 4861625, at *9 (Pa. Super. Ct. Oct. 26, 2017).[14] Thus, Plaintiff does not merely allege the misappropriation of funds, but also Plaintiff's labor and skills in assisting its client with its PPP application, which resulted in Defendants obtaining and subsequently withholding Plaintiff's agent fees.[15] FAC at ¶¶ 104-108.

Alternatively, Defendants argue that Plaintiff's misappropriation claim is subsumed by her conversion claim by relying on a misreading of *Yandrisovitz v. Ohio State Life Ins. Co*., No. 5:18-CV-1036, 2018 WL 4203840, at *3 (E.D. Pa. Aug. 31, 2018). The *Yandrisovitz* court's dismissal of plaintiff's misappropriation claim was due to plaintiff's misappropriation claim being one for funds, and not primarily because it "duplicate[d]" the plaintiff's conversion claim. *Id.*

### C.    Plaintiff adequately alleges violations of Pennsylvania's UTPCPL

Plaintiff alleges actionable claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, *et seq.*, because Plaintiff alleges Defendants committed unfair or deceptive practices by unlawfully withholding PPP agent fees from Plaintiff, resulting in Plaintiff sustaining ascertainable losses. FAC at ¶¶ 83-90.

---

[14]  Plaintiff acknowledges that the misappropriation claim is more aptly dubbed, "unfair competition." Plaintiff is amenable to renaming this claim to avoid any potential confusion.

[15]  Accordingly, Defendants' citations regarding the "misappropriation of funds" are inapplicable. *See Story v. Citizens Bank*, No. CV 17-29, 2017 WL 3173034, at *1 (W.D. Pa. June 28, 2017) (plaintiff alleged bank deducted from her account twice, and made no allegation regarding misappropriation of labor); *Wen v. Willis*, 117 F. Supp. 3d 673, 677, 683 n.3 (E.D. Pa. 2015) (plaintiff alleged defendants misappropriated money, not labor, invested with defendants).

Defendants challenge Plaintiff's standing to bring a UTPCPL claim by offering a narrow construction of the statute's private action provision. Mot. at 15. It is true that the UTPCPL provides a cause of action for "[a]ny person who purchases or leases goods or services . . . and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful." 73 P.S. § 201-9.2. However, a "plaintiff need not be in direct privity with a defendant to bring an action under the UTPCPL for the defendant's wrongful conduct." *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 547 (E.D. Pa. 2012). Rather, standing is conferred on "those specifically intended to rely upon the fraudulent conduct[] and those whose reasonable reliance was specially foreseeable." *Id.* at 547-48. Here, while Plaintiff was not in direct privity with Defendants regarding the PPP loan applications, Plaintiff's assistance with its client's loan applications—the purchase of mass-marketed services from Defendants (FAC at ¶¶ 9, 38 (Defendants issued more than 70,000 PPP loans))—was not only foreseeable as evidenced by the statutory and regulatory framework of the CARES Act, it was actually known by Defendants, who nonetheless withheld Plaintiff's agent fees. Id. at ¶¶ 48-51. Thus, Plaintiff has standing to bring a UTPCPL claim. Additionally, these reasons undercut Defendants' additional argument that Plaintiff's reliance was unjustifiable.

### III.    Plaintiff May Seek Declaratory Relief

Because Plaintiff alleges valid state-law claims, as set forth above, Plaintiff may seek a declaratory judgment under the Declaratory Judgment Act. *See, e.g.*, *Chicago Pneumatic Tool Co. v. Ziegler*, 151 F.2d 784, 788 (3d Cir. 1945).

### CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied.

Dated:  September 14, 2020                                      Respectfully submitted,

**GOLOMB & HONIK, P.C.**

By: _/s/ Kenneth Grunfeld_
Kenneth Grunfeld, PA ID #84121
**GOLOMB & HONIK, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA  19103
Telephone: (215) 278-4449
Facsimile: (215) 985-4169
Email:   kgrunfeld@golombhonik.com

Elaine S. Kusel, PA ID #328238
**MCCUNE WRIGHT AREVALO LLP**
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Telephone: (973) 737-9981
Email:   esk@mccunewright.com

Richard D. McCune, CA Bar #132124*
Michele M. Vercoski, CA Bar #244010*
**MCCUNE WRIGHT AREVALO LLP**
18565 Jamboree Road, Suite 550
Irvine, California 92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275
Email:   rdm@mccunewright.com
         mmv@mccunewright.com

*Admitted or _Pro Hac Vice_ application
pending

_Attorneys for Plaintiff and Putative Class_

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth J. Grunfeld, Esquire, hereby certify that on this 14th day of September 2020, the foregoing was filed via the Court's CM/ECF Filing System.

Dated:  September 14, 2020                    Respectfully submitted,

*/s/Kenneth J. Grunfeld*
Kenneth J. Grunfeld, Esquire

*Attorney for Plaintiff*